# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHICAGO AREA INTERNATIONAL ) <br> BROTHERHOOD OF TEAMSTERS ) <br> SEVERANCE AND RETIREMENT ) <br> FUND, et al., ) <br> ) <br>       Plaintiffs, ) <br> ) <br>    v. ) <br> ) <br> SEBERT LANDSCAPING CO., ) <br> ) <br>       Defendant. ) | No. 14-cv-00338 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chicago Area International Brotherhood of Teamsters Severance and Retirement Fund ("the Fund") and its Trustees have brought this action under the Employee Retirement Income Savings Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.[1] The Fund and the Trustees allege that Defendant Sebert Landscaping Company ("Sebert") improperly refused to allow the Fund to audit its records and also failed to make certain payments to the Fund as required by the multiemployer collective bargaining agreements ("CBAs") to which Sebert was a party. In its defense, Sebert contends that some of the employees for whom the Fund seeks contributions were not in fact entitled to contributions. After Sebert finally submitted to an audit, the parties filed cross-motions for summary judgment. For the reasons that follow, the Court grants summary judgment in favor of the Fund.

---

[1] The Fund's Trustees are Howard C. Murdon, Ronald Sandack, Patrick Brune, and Michael G. Philipp.

# BACKGROUND

I. **The Parties and the CBAs**

The Fund is a multiemployer severance and retirement benefit plan located in Illinois.[2] Sebert is a small landscaping company located in Illinois. Sebert must contribute to the Fund pursuant to a series of multiemployer CBAs into which it entered with the International Union of Operating Engineers Local 150, AFL-CIO ("Local 150") and the International Brotherhood of Teamsters Local 703 ("Local 703"). (*See* Def.'s Resp. Pls.' Statement of Undisputed Material Facts ("SOF") ¶ 2, Dkt. No. 64.) Neither local is party to this lawsuit.[3]

The CBA required Sebert to contribute to the Fund for each hour that a member of Local 150 or Local 703 worked in certain job titles, provided that the member "had completed his or her probationary period." (*See, e.g.*, 2010 CBA Art. VII(D) at 30 of 36, Dkt. No. 45-4.)) Those job titles include Truck Driver, Water Truck Operator, and Installer. (*Id.*)

The CBA describes an Installer as a worker "engaged primarily in the non-mechanized laying of, mechanized cutting of and/or non-mechanized decorative arrangement of paving bricks; building of retaining walls; and the non-mechanized laying of, installation of and/or assembly of irrigation pipe." (2010 CBA Art. IV at 5 of 36.) The CBA required Sebert to maintain at least one Installer "on any job requiring work building retaining walls or brick

---

[2] A multiemployer plan is a pension "to which more than one employer is required to contribute" and that is "maintained pursuant to one or more [CBAs] between one or more employee organizations and more than one employer." 29 U.S.C. § 1002(37)(A). "Multiemployer plans benefit 'workers who are employment peripatetic by nature,' who over time may work for 'many small companies that are too small to justify an individual plan.'" *Laborers' Pension Fund. v. W.R. Weis Co., Inc.*, No. 15-cv-07867, 2016 WL 1535163, at * 5 (N.D. Ill. Apr. 15, 2016) (quoting *Matter of Appletree Mkts., Inc.*, 19 F.3d 969, 978 (5th Cir. 1994)).

[3] Multiple CBAs were in effect during the time period relevant to this suit. The first-in-time CBA relevant here was in effect from January 1, 2007 through December 31, 2009. (Def.'s Resp. Pls.' SOF ¶ 3.) A successor CBA ("2010 CBA") bound the parties from January 1, 2010 through December 31, 2012. (*Id.* ¶ 4.) Because the provisions material to the present dispute did not change, for ease of reference the Court refers to all of the CBAs collectively as "the CBA."

paving" and at least two Installers "[o]n any landscape project for which [Sebert] contract[ed] solely for work requiring the building of retaining walls or brick paving." (2010 CBA Art. II(c) at 2 of 36.)

The CBA describes a Landscape Helper as "work[ing] with and assist[ing] Installers," among other job titles, "in the performance of all landscape work covered by" the CBA. (2010 CBA Art. IV at 5–6 of 36.) The CBA further prohibits Landscape Helpers from "perform[ing] any duties that are assigned exclusively to other classifications in this agreement." (*Id.*) In addition, after completing three seasons as a Landscape Helper, a worker is "eligible for promotion to the Plantsmen or Installer Trainee classification provided the employee meets" certain other criteria. (*Id.* at 9 of 36.)

Pursuant to the CBA, the Trustees have adopted procedures for collecting delinquent contributions ("Collections Procedures").[4] The Collections Procedures define what makes a contribution delinquent and dictate what additional payments Sebert must make if its contributions are delinquent. Finally, the Trust Agreement provides that an employer must pay the Fund's expenses incurred in collecting delinquent contributions from that employer, including attorneys' fees. (*See* Def.'s Resp. Pls.' SOF ¶¶ 13–21.)

## II. Sebert's Purported Classification of Employees

At issue in this case are Sebert's classifications of certain employees during several different years. In 2009, Sebert classified three employees as Installers: Adalberto Correa-

---

[4] The Trustees sponsor, administer, and are fiduciaries of the Fund. Trustees and their representatives are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of" federal law. 29 U.S.C. § 1104(a)(D). To assist trustees in complying with these duties, a trust agreement may provide trustees and their representatives with broad rights to audit employers' books and records. *Central States Pension Fund v. Cent. Transp., Inc.,* 472 U.S. 559, 568, 571–74 (1985).

Hernandez, Alberto Lopez, and Pedro Garcia. Sebert also classified Agustin Rivera as a Water Truck Driver and two other employees as Landscape Helpers. (*Id.* ¶ 35.)

According to Sebert, these classifications changed for 2010. Either in late 2009, early 2010, or both, Sebert's Construction Manager, Gary Stofcheck, and its Human Resources Manager, Maria Alfaro, met with Mario Martinez, the Local 703 business agent assigned to Sebert. (Def.'s Resp. Pls.' SOF ¶ 52.) Stofcheck and Alfaro told Martinez that because Sebert's revenue was declining, it would either have to reclassify as Landscape Helpers certain employees who had been Installers or decline to recall those employees from layoff for the 2010 landscaping season. (*Id.* ¶ 53.)

Although the parties now agree that Martinez indicated that the reclassification might be acceptable, they dispute the conditions of his acceptance. (*See* Def.'s Resp. Pls.' SOF ¶ 55.) According to the Fund and the Trustees, Martinez stated that the Fund would accept the reclassification only if the reclassified employees did not continue to perform the job duties of Installers. (*Id.*) Sebert, on the other hand, contends that Martinez conditioned consent only on Sebert's commitment to give the affected employees an opportunity for reinstatement to the Installer position when business improved. (*Id.*) Sebert further asserts that, "Martinez knew that, as a result of the reclassification, there were no employees classified as Installers and that installation work therefore had to be done by employees classified as Landscape Helpers." (*Id.* ¶ 56.) Whether or not Martinez actually knew this—and whether or not that knowledge makes a difference—the parties agree that Sebert never actually informed Local 703 that the employees reclassified from Installers to Landscape Helpers would continue to install paving bricks and retaining walls. (*Id.* ¶ 56.)

On or about March 31, 2010, Sebert notified Local 703 that it had reclassified Correa-Hernandez, Lopez, and Garcia as Landscape Helpers. (*Id.* ¶ 57.)[5] Sebert classified no employees as Installers in 2010. (*Id.* ¶ 49.) In 2011, Sebert classified Lopez and Garcia as Landscape Helpers and no employees as Installers. (*Id.* ¶ 37). Because it classified no employees as Installers in 2010 or 2011, Sebert refused to remit any contributions to the Fund for those years. (*Id.* ¶ 49.) Finally, in 2012, Sebert classified two employees as Installers: Lopez and Carlos Quinones. (*Id.* ¶ 38.) That year, Sebert also classified three employees as Landscape Helpers. (*Id.*)

## III.  The Audit

On April 29, 2013, the Fund notified Sebert that the Fund would be conducting an audit of its books and records to confirm that it had contributed to the Fund as required by the CBA. (*Id.* ¶ 25.) On July 30, 2013, an auditor for the Fund, Tim Heilenbach, notified Sebert that for the audit Sebert would have to provide certain records for the period January 1, 2009 through December 31, 2012. (*Id.* ¶ 26.) Sebert admits that its "initial response to the auditors" was to "refus[e] to provide" certain records. (*Id.* ¶ 27.) The Fund and the Trustees then commenced this action on January 17, 2014.[6] The initial complaint alleged that Sebert had failed to pay contributions owed to the Fund. A few weeks later, Sebert indicated that it would produce a full set of the records Heilenbach had requested by April 15, 2014. (*Id.* ¶ 32.) Sebert ultimately provided Heilenbach with a full set of the requested records. (*Id.* ¶ 33.)

After completing the fieldwork, Heilenbach produced an audit report. Sebert does not contest some portions of that audit report. In particular, Sebert acknowledges that, as concluded

---

[5] Sebert's notification took the form of three separate letters, each signed and dated by a reclassified employee. (*Id.* ¶ 57.)

[6] ERISA authorizes a fiduciary to bring a civil action to enforce the terms of an employee pension or welfare benefit plan. *See* 29 U.S.C. §§ 1002(3) (defining "plan"), 1132(a)(3).

5

by the audit report, it did not contribute to the Fund for 3 hours worked by Correa-Hernandez in May 2009; 40 of the 229 hours worked by Rivera as a Water Truck Driver in October 2009; 16.5 hours that Tavares worked in October 2011; the hours worked by Quinones and Lopez in 2012, a year for which Sebert classified them as Installers but did not remit contributions for them; and the hours worked in 2012 by Garcia, whose name did not appear on Sebert's classification list for that year. (*Id.* ¶¶ 40-42.) Sebert denies that it omitted these contributions intentionally. (*Id.*)

Other parts of the audit report are contested. The auditor concluded that Sebert owed contributions for the hours worked by Correa-Hernandez, Garcia, and Lopez in 2010 and 2011, *i.e.*, the years Sebert reclassified them as Landscape Helpers. (*Id.* ¶ 45.) Sebert, however, denies that it was required to contribute to the Fund on behalf of employees whom it classified as Landscape Helpers. (*Id.*) Therefore, taking the position that it had no employees classified as Installers in 2010 and 2011, Sebert has refused to remit any of the amounts sought by the Fund. (*See id.* ¶ 49.)

## IV. Post-Audit Posture

Before Heilenbach performed the audit fieldwork and produced the audit report, which found an amount due to the Fund, the Fund and the Trustees already had filed the initial complaint in this case. So the Fund and the Trustees filed an amended complaint on November 13, 2014 to reflect the audit's conclusions. The Fund and the Trustees now seek summary judgment on the claims asserted in that amended complaint. In particular, they seek a judgment in favor of the Fund in the amounts of $25,039.51 in delinquent contributions, $5,007.90 in liquidated damages, and $8,806.89 in audit costs, as well as undetermined amounts of interest on the delinquent contributions and fees and costs.

Sebert also seeks summary judgment in its favor. It contends that the workers for whom the Fund argues Sebert's contributions are delinquent were classified as Landscape Helpers, not Installers, and so were not entitled to the allegedly delinquent contributions. Sebert also contends that Local 703 acquiesced in this reclassification, although Sebert contends that Local 703's acquiescence was not required. Sebert seeks summary judgment in its favor.

## DISCUSSION

Summary judgment is appropriate if, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

### I.  Sebert's Liability for Uncontested Failures to Contribute

The Fund and the Trustees seek summary judgment on their claim that Sebert failed to contribute to the Fund for the following delinquencies identified by the audit report: 3 hours worked by Correa-Hernandez in May 2009; 40 of the 229 hours worked by Rivera as a Water Truck Driver in October 2009; 16.5 hours that Tavares worked in October 2011; the hours worked by Quinones and Lopez in 2012; and the hours worked by Garcia in 2012.

Under ERISA, an employer must "maintain records of its employees' hours to enable the calculation of benefits due and to fulfill the employer's reporting duties." *Sullivan v. Tag Plumbing Co.*, No. 08-cv-03669, 2012 WL 3835526, at *5 (N.D. Ill. Sep. 4, 2012) (citing 29

7

U.S.C. § 1059(a)(1)). "If an ERISA plan can show that an employer's records are deficient and 'produces an apparently sound accounting suggesting that money is owed,' the burden shifts to the employer to establish that it complied with the plan." *Id.* (quoting *Chicago Dist. Council of Carpenters Pension Fund et al. v. Reinke Insulation Co.*, 347 F.3d 262, 264–65 (7th Cir. 2003)). In such a circumstance, "the court should presume that the auditor's calculations are correct" until the employer carries its burden. *Reinke Insulation Co.*, 347 F.3d at 264.

Sebert does not dispute that it failed to record certain payments. In fact, it does not attempt to introduce evidence that the audit report reflected an incorrect accounting of on whose behalf Sebert contributed to the Fund. For the employees on whose behalves Sebert acknowledges that it was responsible for contributions, Sebert does not offer any explanation as to why the audit report is incorrect on those debts. Accordingly, the Court grants summary judgment to the Fund on its claims seeking payment from Sebert for these delinquencies. *Cf. Laborers Pen. Fund v. RES Environ. Servs.*, 377 F.3d 735, 738–39 (7th Cir. 2004) (finding that an employer failed to meet its burden to defeat a fund's motion for summary judgment when the governing CBA's plain language provided that the particular employees for whom the employer did not contribute were "to be included in the bargaining unit" and that employer failed to produce "suffice evidence to establish" the audit report wrongly included hours devoted to hours for which the employer was not responsible for contributions).

The Fund and the Trustees also argue that the Court should defer to the audit report's conclusion that Sebert failed to contribute on behalf of the employees who Sebert purported to reclassify. That conclusion by the auditor consists of two parts. First, the audit report determined that Sebert owed contributions because the employees actually were Installers, not Landscape Helpers. Second, the audit report determined that Sebert did not in fact contribute on their behalf

8

for the work in question. Sebert does not contest the latter determination. Sebert does argue, however, that that the audit report is wrong to conclude that it owed any contributions because the plain language of the CBA allows Sebert unfettered discretion to reclassify employees and to contribute (or not contribute) to the Fund for their work accordingly. After reviewing the audit report, the CBA, and the governing statutory authority, the Court finds that the audit report is correct.

## II.     Contributions for Installers Reclassified as Landscape Helpers

ERISA requires that,

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a [CBA] shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Sebert was such an employer. The Fund contends that Sebert failed to comply with this ERISA provision because it failed to make contributions for the former Installers who it reclassified as Landscape Helpers. To determine whether Sebert was obligated to contribute for those employees, the Court turns to the language of the CBA.

The CBA's definitions of Installer and Landscape Helper distinguish between the two job positions. Installers work with paving brick, among other things; Landscape Helpers help Installers and others. The parties here dispute precisely what work the newly-classified "Landscape Helpers" performed in that classification, but Sebert admits that "some of the work performed after the reclassification was similar to some of the work performed before." (Def.'s Resp. Pls.' SOF ¶ 62, Dkt. No. 64.) In defense of these work assignments, Sebert observes that the CBA allowed the Landscape Helpers to "work with and assist Installers." But Sebert did not employ any Installers during the years in question. Thus, the former Installers performing

9

installation work were not "work[ing] with" or "assist[ing]" new Installers—they were just doing the work of Installers. That makes them Installers, as defined by the CBA. As the Seventh Circuit has recalled in another context, when President Lincoln "was asked how many legs a donkey has if you call its tail a leg[, h]is answer was four: calling a tail a leg does not make it one." *Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d 635, 637 (7th Cir. 2011).

Moreover, although the CBA allows Landscape Helpers to "assist" Installers, the CBA explicitly requires Sebert to employ two Installers on every job requiring installation of paving brick. This requirement clearly prevented Sebert from classifying the only workers on a job involving the installation of paving brick as Landscape Helpers.

Sebert's argument is that, as a matter of law, it was entitled to classify its employees however it liked and to compensate them accordingly. But it is impossible to read the CBA the way that Sebert does. The plain language of the CBA obligates Sebert to contribute to the Fund for work performed by each Installer; the CBA also plainly defines what work an Installer performs and on what jobs Sebert must employ a certain number of Installers. Sebert's reading—which would allow it to avoid its compensation obligations to certain employees by simply renaming their positions—would render those sections of the CBA a practical nullity. *See Peoples Gas Light & Coke Co. v. Beazer E., Inc.*, 802 F.3d 876, 881 (7th Cir. 2015) (stating that courts "should not interpret a contract in a manner that would nullify or render provisions meaningless" (internal quotations and citations omitted)).

In support of its reading of the CBA, Sebert emphasizes the CBA's provision regarding management rights. That provision "reserved to Sebert" rights to take certain actions, providing that Sebert "retain[ed] all rights vested in it . . . , including . . . the management of the company and all its departments, determination of the size of the work force, . . . the right to . . . assign

employees to jobs and allocate work . . . ." (Def.'s SOF ¶ 26, Dkt. No. 50 (emphases omitted).) But despite Sebert's insistence that these rights are "the ones at issue," the provision does not apply here. While Sebert's management rights entitled it to employ members of the local as Installers or, if it preferred, as Landscape Helpers, it did not entitle Sebert to use employees as if they were Installers but compensate them (and the Fund) as if they were Landscape Helpers.

In further support of its view of the CBA, Sebert cites two Seventh Circuit cases: *Central States, Southeast and Southwest Areas Pension Fund v. Hartlage Truck Service, Inc.*, 991 F.2d 1357 (7th Cir. 1993), and *Indiana State Council of Roofers Health and Welfare Fund v. Adams Roofing Company of Kokomo, Inc.*, 753 F.2d 561 (7th Cir. 1985). Neither of these two cases, however, stands for the proposition that an employer may unilaterally reclassify employees in a manner contrary to the explicit terms of the CBA. Indeed, *Hartlage* affirms the general proposition that the Court "must enforce the terms of [CBAs] when those terms are unambiguous." 991 F.2d at 1361. And as discussed above, the unambiguous language of the CBA here supports the Fund's position.

In *Hartlage*, the Seventh Circuit considered CBAs that divided employees into classifications of casual, probationary, and regular seniority employees. *Id.* at 1360. The CBAs defined as casual employees those who the employer hired to fill in for regular seniority employees who were themselves absent, sick, or injured. *Id*. The employer could classify an employee as casual simply by designating him as such when hiring him. *Id.* at 1360. The CBAs in *Hartlage* required the employer to contribute to the plaintiff fund only for the regular seniority employees. *Id*. at 1359. The employer did not remit contributions for three employees, who were designated as casual because they were brought in as replacements for employees who were injured and sick. *Id.* Those replaced employees ultimately did not return to work, and the fund

11

sued for contributions under the theory that the replacement employees were in fact regular seniority employees. The court rejected the fund's claims, determining that the CBAs unambiguously provided that permanent replacements for regular seniority employees lost to absence, sickness, or injury could be "casual employees" and that the factual record substantiated that the replacement employees were serving in the roles of "casual employees" as defined by the CBA. *Id*. at 1359–61.

Similarly, in *Adams Roofing*, the trust agreement for the plaintiff fund required contributions for any employees whose wage rates were established in the CBAs. 753 F.2d at 564. The employer hired employees and classified them under a job title not mentioned in the CBA. The court determined that the skills and duties of those employees differed substantially from the employee classifications whose rates the CBA had established. *Id.* at 564. As such, the employer's failure to contribute for hours worked by employees in the classification not mentioned in the CBAs did not violate ERISA. *Id.*

This case is easily distinguishable from *Hartlage* and *Adams Roofing*. It is not like *Hartlage*, where the employees were found ***in fact*** to be working as "casual employees" and not "regular seniority employees." Nor is it like *Adams Roofing*, where the employees were found ***in fact*** to have skills and duties that differed from the governing CBA employment-classification scheme. Instead, here, the record shows that the nominal "Landscape Helper" employees were ***in fact*** doing the same work they were doing before as "Installers." Under these CBAs, in this situation, Sebert could only alter its contribution obligations for the former Installers by reclassifying them as "Landscape Helpers" and actually employing them in that defined role.

The Court also rejects Sebert's argument that Local 703's actions ratified Sebert's "reclassification." For one thing, even according to Sebert's version of the facts, Local 703's

12

agent's statements and actions did not ratify Sebert's decision to "reclassify" Local 703's members to positions that cost Sebert less but required the members to perform the same work. In any case, the Fund is a third-party beneficiary of the CBA. Any agreement that Local 703 and Sebert may have reached regarding Sebert's obligation to make contributions did not bind the Fund and its Trustees and does not serve as a defense to this lawsuit. *See Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1258 (7th Cir. 1994) ("No matter what an employer and local union agree orally, the collective bargaining and contribution agreements establish the employer's obligation to the pension fund, which is not party to local understandings and limitations."); *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir. 1988) (finding that "a claim that the union has promised not to collect a payment called for by [the CBA] is not a good answer" to a lawsuit to collect payment by the fund trustees).

For the foregoing reasons, the Court grants the Fund summary judgment in its favor on all of its claims regarding delinquent contributions.

## III. Relief

ERISA provides that, when the Court enters judgment on behalf of a plan in an action brought by a fiduciary, such as the Trustees, for or on behalf of a plan to enforce contribution obligations, "the court ***shall*** award the plan" the unpaid contributions, interest on the unpaid contributions, liquidated damages,[7] reasonable attorney's fees and costs, and other damages the court deems appropriate. 29 U.S.C. § 1132(g)(2) (citing 29 U.S.C. § 1145). The Seventh Circuit has stated that a plan's audit costs are also recoverable under 29 U.S.C. § 1132(g)(2). *Moriarty ex rel. Local Union No. 727 v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005). Thus, as the Court has granted summary judgment to the Fund on its ERISA contribution claims, the Fund is entitled to

---

[7] The amount of liquidated damages to be awarded is detailed in 29 U.S.C. § 1132(g)(2)(C).

the unpaid contributions, the associated interest, its liquidated damages, its audit costs, and its reasonable attorney's fees and costs.

## CONCLUSION

For the foregoing reasons, the Court grants the Fund's summary judgment motion (Dkt. No. 44) and denies Sebert's summary judgment motion (Dkt. No. 48). Judgment shall be entered in favor of the Fund for $25,039.51 in delinquent contributions, $5,007.90 in liquidated damages, and $8,806.89 in audit costs. In addition, Sebert shall pay the Fund interest on the delinquent contributions until the entry of final judgment, as well as the Fund's attorney's fees and costs.

ENTERED:

Dated: October 27, 2016

Andrea R. Wood
United States District Judge